IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

BENVENUTO CELLINI,

                                           Case No.:

      Plaintiff,

v.

BAYVIEW LOAN SERVICING, LLC d/b/a
BAYVIEW LOANS, LLC; NEWREZ LLC
DBA SHELLPOINT MORTGAGE
SERVICING, and THE BANK OF NEW YORK
MELLON A/K/A THE BANK OF NEW
YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2006-20CB
MORTGAGE PASS THROUGH
CERTIFICATES SERIES, 2006-20CB

      Defendants.

_____/

## **COMPLAINT**

**COMES NOW**, Plaintiff, BENVENUTO CELLINI (hereinafter, "Plaintiff"), by

and through the undersigned counsel, and hereby sues Defendants, BAYVIEW LOAN

SERVICING D/B/A Bayview Loans, LLC (hereinafter, "BAYVIEW"), NEWREZ LLC

DBA SHELLPOINT (hereinafter, "SHELLPOINT") and The Bank of New York Mellon

A/K/A The Bank of New York, as Trustee for the Certificateholders CWALT, Inc.,

alternative Loan Trust 2006-20CB Mortgage Pass Through Certificates Series, 2006-20CB

(hereinafter "BONY") (collectively, "Defendants"). In support thereof, Plaintiff states:

## **PRELIMINARY STATEMENT**

1

1.      This is an action for damages for violations of the Florida Consumer Collection Practices Act, Chapter 559, Florida Statutes (hereinafter, the "FCCPA") the Fair Debt Collection Practices Act, 15 United States Code, Section 1692 *et seq.* (hereinafter, the "FDCPA"), 12 United States Code, Section 2605 (hereinafter, "RESPA"), and for breach of contract, wherein the Defendant and its representatives attempted to collect a consumer debt from Plaintiff on a mortgage that was modified pursuant to a Stipulation and Order in Settlement of Movant's Objection to Confirmation of Debtor's Chapter 13 Plan entered in Plaintiff's Bankruptcy Case—by using collection letters, refusing payments, and by threatening foreclosure in an unlawful attempt to collect the alleged debt from Plaintiff .

2.      Additionally, despite Plaintiff' repeated meritorious disputes of the account's alleged delinquency status, Defendants continued to assert that the loan is in default or have caused the loan to go into default by refusing Plaintiff's timely payments.

## JURISDICTION, VENUE & PARTIES

3.      This is an action for damages which exceeds $30,000 exclusive of attorneys' fees and costs.

4.      Jurisdiction and venue for purposes of this action are proper in New Port Richey, Pasco County, Florida, and are conferred by Fla. Stat. § 559.77.

5.      Defendants are subject to the jurisdiction of this Court as Defendants each regularly transact business in Pasco County and the events described herein occur in Pasco County, Florida.

6.     Venue is proper as the acts and transactions described herein occurred in Pasco County, Florida.

7.     At all material times herein, Plaintiff is a natural person residing in Pasco County, Florida.

8.     At all material times herein, BONY is a foreign limited liability company authorized to conduct business in Florida, with its principal place of business located at 240 Greenwich Street, New York, New York 10286.

9.     At all material times herein, NEWREZ LLC d/b/a Shellpoint Mortgage Servicing is a foreign limited liability company existing under the laws of the state of Delaware, with its principal place of business located at 1100 Virginia Drive, Suite 125, Fort Washington, PA 19034.

10.     At all material times herein, Bayview is a foreign limited liability company existing under the laws of the state of Delaware, with its principal place of business located at 4225 Ponce De Leon Blvd, 5th Floor, Coral Gables, FL 33146.

## GENERAL ALLEGATIONS

11.     At all material times herein, Plaintiff is a "debtor" or "consumer" as defined by Florida Statutes, Section 559.55(8) and 15 United States Code, Section 1681a(c).

12.     At all material times herein, Plaintiff is a borrower as that term is defined RESPA.

3

13.     At all material times herein, each of the Defendants, themselves and through its affiliates, regularly attempts to collect debts, including but not limited to, alleged balances due from Plaintiff on a modified mortgage loan.

14.     At all material times herein, each of the Defendants qualify as a "person" subject to Florida Statutes Section 559.72.   *See* Florida Statutes, Section 559.55(3); *Schauer v. General Motors Acceptance Corp.*, 819 So. 2d 809 (Fla. 4th DCA 2002).

15.     At all material times herein, BONY was the originator, investor or servicer of the loan and was a creditor as defined by Florida Statutes, Section 559.55(5).

16.     At all material times herein, SHELLPOINT was the servicer or sub-servicer of the loan for BONY and was a creditor as defined by Florida Statutes, Section 559.55(5).

17.     At all material times herein, SHELLPOINT was the servicer or sub-servicer of the loan for BONY and is a debt collector as defined by Florida Statutes, Section 559.55(7).

18.     At all material times herein, SHELLPOINT is a servicer of Plaintiffs' federally related mortgage loan as those terms are defined by RESPA, 12 U.S.C. § 2602(1) and 12 U.S.C. § 2605(1)(2).

19.     At all material times herein, BAYVIEW was the servicer or sub-servicer of the loan for BONY prior to Shellpoint and was a creditor as defined by Florida Statutes, Section 559.55(5).

20.     At all material times herein, each of the Defendants use interstate mail while engaging in a business, the principal purpose of which is the collection of consumer debts.

4

21.     At all material times herein, each of the Defendants attempts to collect a debt, including but not limited to, an alleged balance on the account (i.e. "Mortgage Account").

22.     At all material times herein, each of the Defendants is a "consumer collection agency" within the definition established by Florida Statutes, Section 559.55(3) in that it is a business entity engaged in the business of soliciting consumer debts for collection or of collecting consumer debts.

23.     At all material times herein, each of the Defendants attempted to collect debts, including but not limited to, alleged balances due from Plaintiff on a mortgage loan, referenced by a current loan identification number of 0579472631, (herein, the "Account" or "Debt").

24.     At all material times herein, the alleged balance due on the Account is a consumer debt, an obligation resulting from a transaction for goods or services incurred primarily for personal, household, or family use.

25.     At all material times herein, each of the Defendants' conduct regarding the Account complained of below qualifies as "communication" as defined by Florida Statutes, Section 559.55(2).

26.     At all material times herein, Bayview and Shellpoint make and service numerous loans which are "federally related mortgage loans" as defined in 12 U.S.C. § 2602, in that they are secured by a lien on residential real property designed principally for the occupancy of one to four families, and in that thy are made by "creditors"

5

which make or invest in residential real estate loans aggregating more than $1,000,000.00 per year, including Plaintiff's loan.

27.     At all material times herein, Defendants act themselves or through their agents, employees, officers, members, directors, successors, assigns, principals, trustees, sureties, subrogees, representatives, third-party vendors, and insurers.

28.     All necessary conditions precedent to the filing of this action occurred, or Defendants waived the same.

## FACTUAL ALLEGATIONS

29.     A mortgage was recorded against Plaintiff' real estate property in favor of Countrywide Home Loans, Inc. by virtue of a Promissory Note dated April 28, 2006 (i.e., the "Debt").

30.     The Debt was incurred primarily for personal, household or family use. More specifically, the Debt was used to obtain Plaintiff homestead residence.

31.     In 2016, Plaintiff encountered financial difficulties and filed for bankruptcy under Chapter 13 in the Middle District of Pennsylvania, Case No. 16-bk-01439 (the "Bankruptcy Case").

32.     On August 15, 2016, BONY filed its Proof of Claim in Plaintiff's Bankruptcy Case, indicating an amount owed of $612,005.33 and an amount of $311,481.65 to cure any alleged default.

33.     On September 7, 2016, BONY filed an objection to  confirmation of Plaintiff's Chapter 13 Plan.

34.     On or about March 31, 2017, Plaintiff and BONY entered into a confidential Stipulation resolving BONY's Objection to Confirmation of Plaintiff's Chapter 13 Plan ("Stipulation").

35.     On June 17, 2019,  Plaintiff received his discharge of debt which discharged the unsecured portions of the loan as set forth in the Stipulation.

36.     Despite Plaintiff having successfully completed his Chapter 13 Plan and compliance with the Stipulation, on October 8, 2019 Bayview on behalf of BONY, sent a written communication to Plaintiff in an attempt to collect the Debt, reflecting a Total Amount Due of $10,714.88 and a negative escrow balance of $40,262.19.

37.     The immediately aforementioned communication further assessed $11.00 for property inspections.

38.     On October 16, 2019, a written communication was sent by Bayview on behalf of BONY, in an attempt to collect the Debt, reflecting a Total Amount Due of $10,789.88 and a negative escrow balance of $40,262.19.

39.     The immediately aforementioned communication further assessed a $75.00 "Foreclosure Attorney Fee" and reflected $1,200.00 being held in suspense despite the monthly payment being only $1,189.32.

40.     On October 17, 2019, a written communication was sent by Bayview on behalf of BONY, in an attempt to collect the Debt, reflecting a Total Amount Due of $8,411.24 and a negative escrow balance of $40,262.19.

41.     The immediately aforementioned communication further reflected the application of $2,378.64 from suspense.

42.     On October 21,2019, a written communication was sent by Bayview on behalf of BONY, in an attempt to collect the Debt, reflecting past due payments in the amount of $7,135.92.

43.     On November 18, 2019, a written communication was sent by Bayview on behalf of BONY, in an attempt to collect the Debt, reflecting multiple credits for payments of fees in the amounts of $99,999.00, $0.99, $9,999.00, and $757.06. The communication assessed $11.00 for property inspections and further reflected an escrow advance for homeowner's insurance premium in the amount of $817.34.

44.     There was no basis to assess $817.34 for homeowner's insurance because Plaintiff had purchased his own policy as required by the Stipulation.

45.     Thereafter, Plaintiff sent a notice of error regarding the misapplication of his monthly payments and improper force placed insurance despite Plaintiff having his own insurance policies.

46.     On November 18, 2019, a written communication was sent by Bayview on behalf of BONY in response to Plaintiff's notice of error. The communication claimed that there were several months where post-petition payments were not received and that the loan was due for May 1, 2019.

47.     On December 16, 2019, a written communication was sent by Bayview on behalf of BONY, in an attempt to collect the Debt, reflecting a Total Amount Due of $11,773.71 and a negative escrow balance of $41,346.05.

48.     The immediately aforementioned communication further reflected an escrow advance of $266.52 for homeowner's insurance premium.

8

49.     On January 23, 2020, a written communication was sent by Bayview on behalf of BONY, in an attempt to collect the Debt, reflecting a Total Amount Due of $11,491.22 and a negative escrow balance of $40,262.19.

50.     The immediately aforementioned communication reflected an increased monthly payment due of $2,162.15, reflected multiple misapplications and reapplications of payments, and further reflected a suspense payment of $1,189.32.

51.     On February 1, 2020, the Account was service transferred from Bayview to Shellpoint.

52.     Shortly after the transfer, Shellpoint refused to take Plaintiff's payments, claiming that Plaintiff did not make payments  since July 2019, despite Plaintiff having sent proof of the payments and insurance.

53.     Plaintiff grew frustrated and concerned with the servicing of the Account on behalf of BONY and retained legal counsel, Jay W. Moreland, P.A. for assistance.

54.     On May 14, 2020, Plaintiff, through his legal counsel sent a qualified written request to Shellpoint disputing Shellpoint's refusal to accept payments and further disputing the increased payment amounts in the monthly statements on account of escrow advances for insurance.

55.     On June 19, 2020, Shellpoint responded to Plaintiff's qualified written request indicating that payments were kept in a suspense or "unapplied balance" because the loan was in bankruptcy and that those payments were applied commencing in July 2019, and thereafter applying an unapplied balance on September 4, 2019 in the amount of

9

$39,695.94 to the payments accrued from May 16, 2016 through January 1, 2019. A true and correct copy of the letter is attached hereto as Exhibit A.

56.     On March 16, 2021, Shellpoint on behalf of BONY sent a written communication in an attempt to collect the debt, demanding the sum of $60,525.87 be paid before March 30, 2021 or the Account would be referred to foreclosure.

57.     On March 22, 2021, Plaintiff sent a second qualified written request to Shellpoint (hereinafter "Second QWR") (i) enclosing a check for the 2020 taxes that Shellpoint paid, (ii) disputing the force placed insurance charges, and (iii) requesting that the credit report be updated.

58.     On March 24, 2021, Shellpoint responded to Plaintiff's Second QWR indicating that it determined that all payments from June 2017 through November 2017 were not visible on the payment history despite Plaintiff having provided proof of the same. Shellpoint further indicated it would contact Bayview regarding the missing payments. A true and correct copy of the communication is attached hereto as Exhibit B.

59.     On March 28, 2021, Plaintiff sent a third qualified written request ("Third QWR") to Shellpoint outlining the improper servicing of the Account, including misapplication of payments and assessment of improper charges. A true and correct copy of the letter is attached hereto as Exhibit C.

60.     On April 23, 2021, Shellpoint sent a communication to Plaintiff in response to Plaintiff's Third QWR, outlining how amounts were applied to the Account, claiming that no error occurred, returning Plaintiff's payments, and demanding payment of

$64,549.93 to reinstate the Account. A true and correct copy of the communication is attached hereto as Exhibit D.

61.    Thereafter, Plaintiff retained Kopp Law P.A. for the purpose of pursuing this matter against Defendants, and Plaintiff is obligated to pay their attorneys a reasonable fee for their services.

62.    As a direct result of the assessment of amounts that Defendants are not entitled, attempts to collect amounts not owed, and repeated responses that no error has occurred, Plaintiff has suffered emotional distress, anxiety, inconvenience, frustration, annoyance, fear, and confusion, believing that despite his dispute efforts, Plaintiff would lose his home in foreclosure and be subject to Defendants' continued unlawful debt collection attempts.

63.    The FCCPA, Section 559.77, provides for the award of up to $1,000 statutory damages, actual damages, punitive damages, as well as an award of attorneys' fees and costs to Plaintiff, should Plaintiff prevail in this matter against Bayview, Shellpoint, and BONY.

64.    Specifically, Plaintiff has suffered lack of sleep, stress, anger, anxiety, embarrassment, humiliation and shame, all to Plaintiff's damage. Plaintiff has further invested time and energy into resolving this issue with Defendants.

65.    Plaintiff has further sustained actual damages in the amount of late fees, improper force placed insurance charges, property preservation inspections and repairs charges that did not occur, interest being charged to the loan as a result of the alleged default and attorneys' fees assessed by Defendants..

11

66.     At all material times herein, it would have been possible for Defendants to avoid violating the terms of the FCCPA, FDCPA, and RESPA.

**COUNT ONE:**
**UNLAWFUL DEBT COLLECTION PRACTICE—**
**VIOLATION OF FLORIDA STATUTES, SECTION 559.72 et seq.  AGAINST**
**BAYVIEW AND SHELLPOINT**

Plaintiff re-allege paragraphs one (1) through sixty (60) as if fully restated herein and further states as follows:

67.     Defendants, Bayview and Shellpoint are subject to, and violated the provisions of, Florida Statutes, Section 559.55(7) by collecting consumer debts from Plaintiff through means which can reasonably be expected to abuse or harass Plaintiff.

68.     Defendants, Bayview and Shellpoint are subject to, and violated the provisions of, Florida Statues, Section 559.72(9), by attempting to collect the Debt with knowledge that the alleged Debt is not legitimate or by asserting the existence of some legal right when each Defendants know that the right does not exist.

69.     Specifically, Bayview and Shellpoint acted as servicers of the Account for BONY.

70.     Bayview and Shellpoint, had actual knowledge of Plaintiff's Bankruptcy Case, the Stipulation, proof that Plaintiff made all post-petition payments on the Account and that Plaintiff obtained the required hazard and flood insurance.

71.     Despite Bayview and Shellpoint's actual knowledge set forth above, Bayview and Shellpoint assessed and collected fees and charges for (i) pool work that was never done, (ii) title costs where there was no foreclosure filed, (iii) property inspections conducted when the loan was current, (iv) vacancy registration fees when the property was

never vacant, (v) default related costs when the loan was not in default, (vi) force placed insurance where Plaintiff had insurance, and (vii) attorneys' fees that were unilaterally assessed to the Account.

72.     Not only did Bayview and Shellpoint assess these amounts to the loan, but they continue to send communications demanding payments of the same and threaten foreclosure if such illegitimate amounts are not paid.

73.     Bayview and Shellpoint continue to attempt to collect these illegitimate improper amounts and make threats of foreclosure in an attempt to abuse and harass Plaintiff into believing that despite Plaintiff having successfully completed his Chapter 13 and complying with the terms of the Stipulation, ; that Bayview and Shellpoint could and would continue to attempt to collect such amount directly from Plaintiff.

74.     Bayview and Shellpoint's conduct served no purpose other than to annoy and harass Plaintiff and exhaust Plaintiff's will into paying the iilegitimate charges and fees referenced above in addition to the regular monthly payments that Shellpoint now refuses to accept.

75.     In sum, during the course of Bayview and Shellpoint's attempts to collect the Debt, Bayview and Shellpoint knowingly and falsely asserted that Plaintiff is responsible for fees, charges, and escrow advances as listed above despite Plaintiff having made all payments pursuant to the Stipulation and obtaining his own insurance.

76.     Bayview and Shellpoint's willful and flagrant violation of, *inter alia*, the Florida Consumer Collection Practices Act as a means to collect the Debt constitutes

unlawful conduct and harassment as is contemplated under Florida Statutes, Section 559.72(7).

77.   As a direct and proximate result of Bayview's actions, Plaintiff sustained damages as defined by Florida Statutes, Section 559.77.

**COUNT TWO:**
**FAIR DEBT COLLECTION PRACTICES ACT –**
**VIOLATION OF 15 UNITED STATES CODE, SECTIONS 1692 ET SEQ.**
**AS TO SHELLPOINT**

Plaintiff re-allege paragraphs one (1) through sixty (60) as if fully restated herein and further state as follows:

78.   Shellpoint is subject to, and violated the provisions of, 15 United States Code, Section 1692d, by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the Debt.

79.   Shellpoint is subject to, and violated the provisions of, 15 United States Code, Section 1692e, e(2)(A), and e(10), by using false representations and deceptive means in attempting to collect the Account, including by falsely representing the amount, legal status or character of the debt.

80.   Shellpoint is subject to, and violated the provisions of, 15 United States Code, Section 1692f and f(1), by using unfair or unconscionable means to collect the Debt, including by attempting to collect an amount (including interest, fees, charges, or expenses incidental to the principle obligation) not expressly authorized by the agreement creating the debt or otherwise permitted by law.

81.   Shellpoint took over servicing the loan after the loan was allegedly in default and treated the loan as a defaulted loan.

82.     Specifically, Plaintiff repeatedly advised Shellpoint, that the amounts claimed as owed on the Account were inaccurate, overstated, and that the loan was not in default

83.     Plaintiff further provided proof of his payments from 2017 through the date of the transfer and proof of insurance as required by the Stipulation.

84.     Shellpoint further confirmed its knowledge of the same when it indicated in its March 24, 2021 communication that Bayview did not reflect the payments made by Plaintiff between June 2017 and November 2017 and further indicated that it would contact Bayview regarding those payments.

85.     ´ Despite Plaintiff's disputes of Shellpoint's representations of the amounts allegedly owed on the debt and the alleged default of the debt, and despite Shellpoint's actual knowledge of the Stipulation and receipt of proof of such payments, Shellpoint continued to send communications to Plaintiff within the past year in an attempt to exhaust Plaintiff' will and collect the Debt from Plaintiff.

86.     Despite having knowledge of Plaintiff' disputes, Bayview's failure to properly and timely apply payments, and the Stipulation, Shellpointused unfair or unconscionable means to collect the Debt by demanding Plaintiff pay amounts to which neither Bayview nor Shellpoint was entitled within the past year; treating the loan as a defaulted loan despite the loan being current; assessing additional fees and charges to which Shellpoint is not entitled, and repeatedly threatening to foreclose.

87.     Shellpoint's conduct unfairly and unconscionably attempts to coerce payment from Plaintiff regarding the Account over the past year that Plaintiff do not owe,

that are overstated as a result of the prior servicer's failure to timely apply payments it received.

88.     As a result, Shellpoint  attempted to collect an amount from Plaintiff not created by the agreement creating the debt or otherwise permitted by law.

89.     Shellpoint's conduct served no purpose other than to harass, abuse, or oppress Plaintiff into paying the overstated amount of the Debt, Shellpoint knew or should have known that Plaintiff did not owe the additional assessed fees and charges or that the loan was in default, yet continued its collection attempts through repeated letters and threats of foreclosure..

90.     As a direct and proximate result of Shellpoint's actions, Plaintiff sustained damages as defined by 15 United States Code, Section 1692k.

**COUNT THREE:**
**VIOLATION OF RESPA AS TO SHELLPOINT**

Plaintiff re-allege paragraphs one (1) through sixty (60) as if fully restated herein and further states as follows:

91.     Shellpoint is acting as a loan "servicer" for BONY of a "federally related mortgage" as those terms are defined by RESPA, 12 U.S.C. § 26021) and 12 U.S.C. § 2065(i)(2).

92.     Plaintiff has repeatedly disputed the amounts alleged to be owed and the alleged default status of the Account through the appropriate qualified written requests referenced herein.

93.     Shellpoint failed to correct Plaintiff' Account in violation of 12 U.S.C. §2605(e)(2) and 24 C.F.R. §3500.21(e)(3).

94.     Shellpoint failed to conduct an appropriate investigation after receiving Plaintiff's qualified written requests, in violation of 12 U.S.C. §2605(e) (2).

## COUNT FOUR:
## BREACH OF CONTRACT AS TO BONY

Plaintiff re-allege paragraphs one (1) through sixty (60) as if fully restated herein and further states as follows:

95.     A mortgage was recorded against Plaintiff's real estate property in favor of Countrywide Home Loans, Inc. by virtue of a Promissory Note dated April 28, 2006 (i.e., the "Debt"). True and correct copies of the mortgage and promissory note are attached hereto as Exhibit E.

96.     The Mortgage Account was modified by the Stipulation. A true and correct copy is attached hereto as Exhibit F.

97.     Thereafter, the loan was allegedly purchased by and integrated into the Certificateholders CWALT, Inc., alternative Loan Trust 2006-20CB Mortgage Pass Through Certificates Series, 2006-20CB with The Bank of New York Mellon A/K/A The Bank of New York, as Trustee.

98.     BONY utilized Bayview and Shellpoint as servicers or agents on its behalf, to service the loan and accept and apply payments.

99.     BONY either directly or through its agents has breached its contractual obligations in at least the following ways:

> a.  By failing to timely apply all payments received from the Plaintiff post- petition;

17

b. By assessing to the Plaintiff's Account charges and fees not agreed to between the parties, authorized by the loan documents, or which Defendant are not entitled;

c. By improperly allocating payments received from the Plaintiff post-petition to fees and charges not agreed to between the parties or to which Defendants were not entitled;

d. By assessing late payment charges to the Plaintiff's Account despite the fact that the loan was not in default under the terms of the Stipulation;

e. By unilaterally assessing attorneys fees to the Account that Defendants were not entitled or that were not ordered by a court;

f. By assessing charges for escrow advances for force placed insurance where Plaintiff had the proper insurance in place;

g. By declaring the Plaintiff to be in default of the Stipulation  when no such default exists;

h. By threatening to initiate foreclosure proceedings when the Account is not in default;

100. Plaintiff has been irreparably harmed by BONY's conduct, or the conduct of BONY's agents which have exponentially increased the amounts due on the Account under the Mortgage and Stipulation.

**COUNT FIVE:**
**BREACH OF CONTRACT AS TO BAYVIEW**

18

Plaintiff re-allege paragraphs one (1) through sixty (60) as if fully restated herein and further states as follows:

101.    A mortgage was recorded against Plaintiff's real estate property in favor of Countrywide Home Loans, Inc. by virtue of a Promissory Note dated April 28, 2006 (i.e., the "Debt"). True and correct copies of the mortgage and promissory note are attached hereto as Exhibit E.

102.    The Mortgage Account was modified by the Stipulation. A true and correct copy is attached hereto as Exhibit F.

103.    Thereafter, the loan was allegedly purchased by and integrated into the Certificateholders CWALT, Inc., alternative Loan Trust 2006-20CB Mortgage Pass Through Certificates Series, 2006-20CB with The Bank of New York Mellon A/K/A The Bank of New York, as Trustee.

104.    BONY utilized Bayview as a servicer or agent on its behalf, to service the loan and accept and apply payments.

105.    BONY and Bayview are parties to a contract which puts Bayview in privity with the Note and Mortgage.

106.    Bayview either directly or through its agents has breached its contractual obligations in at least the following ways:

        a.   By failing to timely apply all payments received from the Plaintiff post- petition;

b. By assessing to the Plaintiff's Account charges and fees not agreed to between the parties, authorized by the loan documents, or which Defendant are not entitled;

c. By improperly allocating payments received from the Plaintiff post-petition to fees and charges not agreed to between the parties or to which Defendants were not entitled;

d. By assessing late payment charges to the Plaintiff's Account despite the fact that the loan was not in default under the terms of the Stipulation;

e. By unilaterally assessing attorneys fees to the Account that Defendants were not entitled or that were not ordered by a court;

f. By assessing charges for escrow advances for force placed insurance where Plaintiff had the proper insurance in place;

g. By declaring the Plaintiff to be in default of the Stipulation  when no such default exists;

h. By threatening to initiate foreclosure proceedings when the Account is not in default;

107. Plaintiff has been irreparably harmed by Bayview's conduct, on behalf of BONY, which has exponentially increased the amounts due on the Account under the Mortgage and Stipulation.

**PRAYER FOR RELIEF**

**WHEREFORE**, as a direct and proximate result of Defendants' conduct, Plaintiff respectfully requests an entry of:

        a.      Judgment against Bayview declaring that Bayview violated the FCCPA;

        b.      Judgment against Bayview for maximum statutory damages for the violations of the FCCPA;

        c.      Judgment against Bayview enjoining them from engaging in further conduct in violation of the FCCPA;

        d.      Judgment against Bayview declaring that Bayview breached the contract between the parties and for damages incurred as a result of such breach;

        e.      Judgment against Shellpoint declaring that Shellpoint violated the FCCPA, FDCPA and RESPA;

        f.      Judgment against Shellpoint for maximum statutory damages for the violations of the FCCPA, FDCPA and RESPA;

        g.      Judgment against Shellpoint enjoining them from engaging in further conduct in violation of the FCCPA, FDCPA and RESPA;

        h.      Judgment against BONY declaring that BONY breached the contract between the parties and for damages incurred as a result of such breach;

        i.      Actual damages in an amount to be determined at trial;

        j.      Compensatory damages in an amount to be determined at trial;

        k.      Punitive damages under the FCCPA and RESPA in an amount to be

21

determined at trial;

l.   An award of attorneys' fees and costs; and

m.   Any other such relief the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues triable by right.

## **SPOLIATION NOTICE AND DEMAND TO RETAIN EVIDENCE**

Plaintiff hereby gives notice to Defendants and demands that Defendants and

their affiliates safeguard all relevant evidence—paper, electronic documents, or data—

pertaining to this litigation as required by law.

Respectfully submitted,

KOPP LAW, P.A.

*/s/ Rebbecca A. Goodall*
William J. Kopp, Esq.
Florida Bar No.: 83605
Kopplawpa@gmail.com
Rebbecca A. Goodall, Esq.
Florida Bar No.: 0115344
rgoodall.law@gmail.com
360 Central Avenue, Suite 1570
St. Petersburg, FL 33701
(813) 999-3355; (727) 999-2016 (fax)

22

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

BENVENUTO CELLINI,

                                Case No.:

      Plaintiff,

v.

BAYVIEW LOAN SERVICING,
NEWREZ LLC DBA SHELLPOINT MORTGAGE
SERVICING, and THE BANK OF NEW YORK
MELLON A/K/A THE BANK OF NEW
YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2006-20CB
 MORTGAGE PASS THROUGH
CERTIFICATES SERIES, 2006-20CB

      Defendants.

_____/

# EXHIBIT A



**Shellpoint**
Mortgage Servicing

55 Beattie Place, Suite 110
Greenville, SC 29601

Toll Free Phone 1-800-365-7107
Toll Free Fax 1-866-467-1137

*Hours of Operation*
Monday-Friday 8:00AM 10:00PM
Saturday 8:00AM-3:00PM

June 19, 2020



Jay W Moreland, P.A
8520 Government Dr., Suite 2
New Port Richey, FL 34654

RE:     Subject Property: 7719 Hatteras Dr Hudson, FL 34667
        Reference Number: 0579472631
        Homeowner/ Client: Benvenuto J Cellini

Dear Jay W Moreland.

This letter is in response to your recent inquiry regarding the above referenced loan. Shellpoint Mortgage Servicing ("Shellpoint") began servicing the loan on or about February 1, 2020.

Shellpoint is aware this loan was included in a Chapter 13 Bankruptcy and was subsequently discharged. Our records indicate the homeowner intended to retain the property as well as their personal liability upon discharge and completion of the Chapter 13 plan. As such, Shellpoint is servicing the loan in accordance with the original agreement and protecting the creditor's rights in the associated property.

Per the correspondence received you are disputing the delinquency of the Mr. Cellini's loan. You stated Shellpoint admitted the records received from Bayview were inaccurate. You indicated Mr. Cellini made three payments in October 2019 to pay ahead for October, November, and December 2019 and had made all payments from July 2019 until Shellpoint refused to accept the payments. You are also disputing the addition of the taxes and insurance to the escrow account, stating Mr. Cellini has paid his insurance and taxes per the modified agreement. You stated Mr. Cellini will send a check for the balance due and resume monthly installments if Shellpoint will agree to accept his payment.

Shellpoint has reviewed the proof of payment (**enclosed**) Mr. Cellini provided on February 6, 2020 and has determined the payments in questions have been applied correctly to the loan. Payments are applied to the loan on the day they are received. Payments of $1,200.00 was posted to the loan on July 12, 2020; July 25, 2019; August 8, 2019. These payments were posted to the unapplied balance because the loan was in the process of the Bankruptcy ("BK") cram down. The BK cramdown as completed on August 28, 2019, bringing the principal balance to $305,000.00 with a due date of May 16, 2016.

Accordingly, on September 4, 2019, the unapplied balance of $39,695.94 was posted to the due dates of May 16, 2016 through January 1, 2019 bringing the loan contractually due for the February 1, 2019 payment leaving an unapplied balance of $448.38. On October 8, 2019, a payment of $1,200.00 was posted to the February 1, 2019 instalment with $10.68 posted to the unapplied balance. A payment of $2,400.01 was received on October 16, 2020, bringing the unapplied balance to $2,859.07. The March 2019 and April 2019 installments were posted effective October 16, 2019 to

of the loan history summary.

Our records do not indicate Mr. Cellini was advised our documents from Bayview were inaccurate. Should you have evidence the loan history summary is incorrect, please send the necessary documentation with a written explanation via fax at 866-467-1137, or email us at loanservicing@shellpointmtg.com, or mail:

Shellpoint Mortgage Servicing
P. O. Box 10826
Greenville, SC 29603

Shellpoint has confirmed the loan transferred to Shellpoint non-escrowed. However, lender-placed flood insurance was placed on the property due to Mr. Cellini not providing Shellpoint with proof of flood insurance. Shellpoint also received a cancellation notice on May 8, 2020, with an effective cancellation date of May 2, 2020 from Universal Property and Casualty Insurance ("Universal") due to nonpayment of the hazard insurance. If Mr. Cellini does not provide proof of hazard insurance, lender-placed insurance will be purchased for the property. **Enclosed** is a copy of the cancellation notice. We notified Mr. Cellini we needed proof of flood insurance on April 14, 2020; May 14, 2020; and June 1, 2020. We also notified Mr. Cellini we needed proof of hazard insurance on May 19, 2020 and June 18, 2020. **Enclosed** are copies of the lender-placed insurance notices. Should Mr. Cellini provide Shellpoint with proof of flood coverage and hazard coverage with no lapse we will refund the full amount for the lender-placed insurance. If there is a lapse in coverage a partial refund will be given, and Mr. Cellini will be responsible for the lender-place insurance for the lapse in coverage. Shellpoint is only collecting for the lender-placed insurance for the escrow.

Shellpoint has also confirmed Mr. Cellini had delinquent taxes due for 2019 to Pasco County. We submitted payment in the amount of $6,314.82 to Pasco County for the delinquent 2019 taxes. In protecting the creditor's rights in the associated property, we escrowed the taxes.

Shellpoint is committed to assisting homeowners experiencing financial difficulties with a variety of loss mitigation options to avoid foreclosure and allow homeowners to retain homeownership. These may include loan modification, short sale, settlement, or deed-in-lieu of foreclosure. If Mr. Cellini wishes to discuss these options or to bring the loan current, please contact Shellpoint's Loss Mitigation Department at (866) 825-2174. Mr. Cellini may also contact his Single Point of Contact ("SPOC") Soriya Ohia by phone at 888-490-7387 ext. 7741 or my email at sohia@shellpointmtg.com. **Enclosed** is a copy of the SPOC assignment letter.

We have been unable to determine that a servicing error has occurred. You have the right to request documentation supporting our determination.

If you have any additional questions or concerns, please contact our Customer Service department at 800-365-7107.

Sincerely,

Compliance Department
Shellpoint Mortgage Servicing

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

BENVENUTO CELLINI,

                                               Case No.:

      Plaintiff,

v.

BAYVIEW LOAN SERVICING,
NEWREZ LLC DBA SHELLPOINT MORTGAGE
SERVICING, and THE BANK OF NEW YORK
MELLON A/K/A THE BANK OF NEW
YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2006-20CB
 MORTGAGE PASS THROUGH
CERTIFICATES SERIES, 2006-20CB

      Defendants.

_____/

# EXHIBIT B

Mortgage Servicing

55 Beattie Place, Suite 110
Greenville, SC 29601

Toll Free Phone 1-800-365-7107
Toll Free Fax 1-866-467-1137

*Hours of Operation*
Monday-Friday 8:00AM 10:00PM
Saturday 8:00AM-3:00PM

March 24, 2021

Benvenuto J Cellini
7719 Hatteras Drive
Hudson, FL 34667

RE:    Subject Property: 7719 Hatteras Drive, Hudson, FL 34667
       Reference Number: 0579472631

Dear Benvenuto J Cellini:

This letter is in response to your recent inquiry regarding the loan referenced above. Shellpoint Mortgage Servicing ("Shellpoint") began servicing the loan on or about February 1, 2020.

Shellpoint has reviewed the proof of payment provided in your previous correspondence received on February 25, 2021. The proof of payment included bank statements from June 2017 through December 2020.

After reviewing your bank statements, Shellpoint has determined that all of the payments made to the loan between May 2018 and December 2020 have been applied to the account. Please review the enclosed loan history statement showing that the funds were received.

However, Shellpoint has also determined that the payments reflected in your bank statements that were made between June 2017 through November 2017 are not visible in the payment history. Shellpoint has contacted Bayview regarding these payments. Once we receive a reply, we will be able to confirm whether additional funds need to be applied to the loan.

Shellpoint received additional correspondence from you regarding the loan on March 4, 2021. Please know that we are currently researching all of the concerns expressed in your correspondence, and you will receive a formal response addressing these concerns within 30 days of when the correspondence was received.

Please accept our sincere apologies for any inconvenience regarding the issues above. Please know that Shellpoint takes its customer service obligations very seriously and that your concerns have been brought to the attention of the appropriate people within our organization.

Please refer to the enclosed loan history statement.

If you have any additional questions or concerns, please contact our Customer Service department at 800-365-7107.

Sincerely,

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

BENVENUTO CELLINI,

                                          Case No.:

      Plaintiff,

v.

BAYVIEW LOAN SERVICING,
NEWREZ LLC DBA SHELLPOINT MORTGAGE
SERVICING, and THE BANK OF NEW YORK
MELLON A/K/A THE BANK OF NEW
YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2006-20CB
 MORTGAGE PASS THROUGH
CERTIFICATES SERIES, 2006-20CB

      Defendants.

_____/

# EXHIBIT C

To: *Jack navaero president & chief Executive officer*
*Shellpoint mortgage servicing*

Michael Keaton, Executive Vice President and Senior Vice President

Ben Boyer, Vice President of Portfolio Management

Copies: Thomas P. Gibbons, Chief Officer and Director of Bank of New York.

Date March 28th, 2021

From: Benvenuto J. Cellini

7719 Hatteras Drive

Hudson Fl. 34667

The first and most important action that I would like Shellpoint mortgage Servicing to do. Is desist the actions of the letter dated March 16th, 2021, stating that I need to pay 60525.87 no later than 03/31/2021. That in fact if I do not pay the 60,525.87 by 03/31/2021. I will incur an additional 4662.25 and other additional fees and foreclosure proceeding will commence. A copy of this letter will be exhibit 1. I will provide facts of fraudulent charges and activity committed by Bayview loan servicing and now being executed by Shellpoint mortgage servicing to foreclose on my home. I will use the loan history statement provided to me by Shellpoint to prove these fraudulent and excessive fees. I feel because of the value of my house 462,866.00 by Trulia and my appraiser tax office, 351,653. Copies will be attached. Which will be exhibit 2.

1

This is the 3rd letter that I am writing to you informing Shellpoint that the incorrect or fraudulent information that Bayview loan servicing provided to Shellpoint. Because of the incorrect or fraudulent information Bayview provided to Shellpoint. Shellpoint, when they had taken over servicing of my mortgage in February 2020 refused my mortgage payments informing me that I owed my mortgage payment from July 2019 thru December 2019. I informed Shellpoint that in fact that I paid Bayview thru January 2020 and I actually was ahead in my payments in 2019 because I paid Oct., Nov., and December's 2019 payments in October of 2019.

Attached, which will be exhibit 3, a letter dated March 24th, 2021 from Shellpoint verifying that in fact Bayview did not apply payments that I made from July to December. However the unapplied or misapplied payments are in fact from July 2017 thru November 2017. . I would ask that all charges and actions of foreclosure and adding additional cost and expenses to my mortgage be reversed out. These charges should have never occurred. I also would like proof of a letter forwarded to the 3 reporting credit agencies updating my mortgage payments and reinstated as on time and never late.

Questions to Shellpoint Mortgage Servicing about the loan history statement that was sent to me via a secured email.

My first question is, why do we have 16 payments of 13.00 to Cyprexx services for inspections from 03/19/2020 thru 03/11/2021. My wife have been residing in the house since 2017.

02/22/21 unapplied payment 14,400.00. This payment was sent by me for the months of February 2020 thru February 2021. This is when Shellpoint

2

start servicing my mortgage and refusing payments because of fraudulent claims that payments were not made. When in fact Bayview did not apply or wrongly applied to another account.

11/10/20 County tax bill 1 5352.74. I sent check 289 in the amount of 5352.74 with my last letter to cover 2020 real estate taxes and I also sent check 290 for 1200.00 for March 2021 mortgage payment. Which should have everything current. Unless Shellpoint refuses the payments. I ask that Shellpoint updates that payments can be paid on the account.

08/06/2020 Insurance refund 4097.34 and on 07/30/2020 lender placed insurance 5119.80. There is a difference of 122.46. I am not paying this because I had insurance all along and Bayview had copies of all my insurance. But God knows that they are horrible at book keeping.

07/01/2020 Lender flood distribution. 4539.96. You will see on all my Flood insurance policies Bayview Loan Servicing is the First Mortgage and they were sent to Bayview directly from the Flood insurance companies. I also want to reiterate that I am not paying any gaps where you had the coverage and when you decided to reimburse. The Flood insurance should have never been forced because Bayview was sent the documentation on all the insurances. Exhibit 5 will be Fed Nat Flood insurance policy # 9906056142020 from 04/13/220 thru 04/13/2021, Policy # 99060561642019 from 04/13/2019 thru 04/13/2020, Policy # 99060561642018 from 04/13/2018 thru 04/13/2019. I am working on getting Shellpoint the 2017 policy. I will forward at a later date.

03/27/2020 FC cost disbursement 1230.00. I have no idea what this is.

03/03/2020  Modification payment 34295.50. All of these charges are fraudulent. My wife and I have resided in the house since 2017. I see pool work payment of 350..00 on March 03,2020. I am attaching a receipt from lighting pool for the resurfacing of my pool on 09/14/2017. We also had the lanai all rescreened in 2017. When I find this receipt. I will forward it to

3

01/15/2020  Unapplied payment  1189.32

01/15/2020  Unapplied payment  1189.32

01/13/2020  Unapplied payment  1189.32

01/13/2020  Regular payment  1189.32

01/10/2020  Unapplied payment  1200.00

01/10/2020  Unapplied payment  10.68

01/10/2020  Regular payment 1189.32

01/06/2020  Prior service call assess  999.99

01/06/2020  Prior service call assess 155.71

12/23/2019  Escrow only payment. 1083.86

12/19/2019  Attorney cost assess  250.00. I made all the payments and we have a modification agreement signed . Why are there lawyer fees. More fraudulent charges. Let's keep piling them on. We want this house. It has a lot of equity.

12/19/2019  Prior service cost access. 55.00.

12/17/2019  Prop. Pres assess. 11.00

12/10/2019  Hazard Dist. 266.52. No need. I had coverage.

11/14/2019  Hazard dist 817.34  No need I had coverage.

10/25/2019  Prop pres assess. 11.00  assessing what?

10/25/2019  Unapplied payment 2378.64

10/17/2019  Unapplied payment 2378.64

09/06/2019  Unapplied payment  2378.64

5

09/04/2019  Unapplied payment  4757.28.  Bayview and Shellpoint really know how to unapply payments.

09/04/2019  Unapplied payment  10,703.88

09/04/2019  Unapplied payment  10,703.88

09/04/2009  Unapplied payment  10, 703.88

08/28/2019  Unapplied payment  34,295.50. It is funny how this same amount is posted on 03/03/2020  Lets double and triple dip to foreclose on this house in which the value is high and the husband and wife just put over 200,000.00 into fixing it up. Lets rub our greedy hands together.

08/28/2019 escrow payment.  6233.38

08/28/2019 We have 7  escrow only payments.  Are we escrowing or not.

08/28/2019  Principal only payment  30,876.01.  What we escrowing. Home owner insurance payments that I have made and Bayview was sent the documentation on. However, Bayview buried the paper work somewhere.

08/23/2019  Regular payment 36,029.84. Why all these unapplied payments . When I have a modification agreement signed with Bayview? Baffling. These are all that I will list from the loan history report that I received from Shellpoint. I will not be sending this report as Shellpoint had forwarded to me. So Shellpoint should have the loan histort report already.


This is a list of Home Owners Insurances  fraudulently paid by Bayview or Shellpoint

08/06/2020. Insurance refund.  4097.34

07/30/2020  Lender placed Hazard dist. - 5119.80. A difference of  -122.46

who is eating this. Not I. I had insurance all along.

12/10/2019  Haz. Insur. - 266.52

04/02/2019  Hazard dist.  -4485.00

04/02/2018  Hazard dist  -4364.00

11/14/2019 Hazard Insur.  -817.34


Totaling  Home owners insurance premiums that should not have been paid by Bayview or Shellpoint  15,052.66


Flood Insurance paid by Bayview or Shellpoint:

07/01/2020   -4539.98

03/14/2019   986.00

10/08/2018  - 1837.47

04/09/2018  -317.85

04/03/2018  -970.00

03/13/2018  -287.08


Total flood insurance that should not have been paid by Bayview or Shellpoint  8938.00


Total of Home owners and Floyd that Bayview or Shellpoint is billing me for that was paid by myself.  15052.66 + 8938.00 = 23990.66

7

Modification access of 999.99 throughout the loan history report 999.99. What is this?

All the Attorney cost, why? Bayview and I signed a modification agreement.

So now let's take these fraudulent Modification payments 34,295.50. And these are listed multiple times in the report. Why? Maybe to inflate the numbers?

County taxes. Check 289 that I sent to Shellpoint 5352.74

Check 290 in the amount of 1200.00 to that I sent to Shellpoint for March 2021 mortgage payment.

The 14,400.00 check that I sent to Shellpoint and they cashed on 02/21/2021 and have as unapplied.

The 6000.00 in payments that Shellpoint confirmed that they do not see or know what Bayview has done with it. Vanished in the thin air.

So let's add everything up that I have made Shellpoint aware of:  The 23999.66 of Home owners and flood insurances that should never have been paid by Bayview/Shellpoint. I have provided copies of the policies that I paid. With this letter I am sending the copies of the Flood insurance , which show that they were mailed to Bayview.

The 14,400.00 that I paid on 02/21/2021 that Shellpoint cashed the check. However showing unapplied. Maybe that will disappear also.

The 6000.00 is missing mortgage payment to Bayview from July through November of 2017. Missing,  gone. Vanished.

8

This 34,295.50 Fraudulent Modification payment. I want proof and not just cancelled checks. Afford me the same professionalism in presenting my facts with legitimate back up in Layman's terms. Not this Loan history to baffle and confuse. Really take a look at this report. Very confusing.

Home owners insurance paid 23,999.66 + 14,40.,00 mortgage payments made + 6000.00 missing July thru Nov. payments + 34295.50 reported 3 times in the loan history report+ 5352.74 check sent to shell point + 1200.00 for March 2021 mortgage payment. This total is 85,247.90.

So in your letter dated 03/16/2021. Shellpoint states that I owe 60,525.87. I show that you owe me 85,247.90. A difference netting me 19,992.03. You can send the check to Benvenuto J. Cellini, 7719 Hatteras Drive, Hudson Fl. 34667. And wait to you get my bill for me doing Bayview and Shellpoint's work. Did you even look at this trash of a loan history report.

I phoned and called numerous times to Shellpoint since the loan was conveyed over to Shellpoint. Pleading in tears almost. That I made all the payments, Paid the home owners and flood insurance. I pleaded. Please do not foreclose and throw me and my family out on the street. We have put hundreds of thousands of dollars of work into this house. I backed the information up with the documentation. Bayview and Shellpoint said I missed payments from July thru November of whatever year. I proved it wrong with documentation, Home owner and flood insurance . Now the onus is Shellpoint to provide dated photos of the work that they say was completed and when it was completed. I do not just want cancelled checks or invoices. I do not know how all these bills for work being completed after 2017 . When my wife and 13 and 18 year old daughters have been residing in the residence and have never seen anybody doing any work. I guess now

9

that Since I informed Shellpoint that we resided in 2017. Bayview will say all the cost occurred before 2017 to cover their butts.

I am bitter, disgusted and mad as hell. Maybe you can tell from this letter. I am from South Philadelphia. I informed you in an earlier letter that my father passed away in September of 2020. Three months before my parents 65 wedding anniversary. My mother turned 81 in February 2021. In march of 2020. Both of my parents were diagnosed with cancer. My mother is dying. I can't go be by her side because of this fraudulent activity going on. I will get a copy of my Father's death certificate and forward it to you. I have to gather information. Because Shellpoint will tack on even more charges and foreclose on our property and kick us out in the street. You reacted to Bayview's fraudulent information. Il use the word fraudulent sternly. After reviewing these charges. It is absolutely disgusting. I have a company and have been doing property preservation for over 20 years. I never get paid any kind of fees that are being presented in this report. To secure a pool with a lanai. I get 60.00. You put A 139 pad locks on the doors. This absolutely disgusts me. What I see going on here. Is Bayview thought the house was going to foreclosure and inflated all there fees to make extra money on the foreclosure. How many people are losing their home's because they just give up. Bayview and Shellpoint shoves these reports down people's throats to get them dazed and confused. Did Shellpoint even look at this report? Do you think the normal lay person would look at this and understand it? Absolutely disgusting. I am trying to get an appointment with Morgan and Morgan to sue for duress.

I am so livid right now.

Once again. I think I presented enough evidence to stop all additional fees

10

being adding onto this mortgage. Stop the threats of additional cost and foreclosure being added to my property.

So I beg and plead one more time. Please stop all the procedures that you are threatening me with in Shellpoint's letter dated to Benvenuto J . Cellini, 7719 Hatteras Drive, Hudson Fl. 34667 with the date of 03/16/2021. I would like a documented letter from Shellpoint Mortgage Servicing confirming that all this has been completed.

I had taken pictures of my wife and I tearing the house apart and fixing it up in an app called Pruvan that has maps and dates your photos. Providing pictures of all new tile floors, new kitchen, new lights, new appliances, new bathroom vanities, new garage doors. Hopefully I can still get the pictures. I accidentally closed the file. I will let you now and forward file if I can get it.

Sincerely, Thanking you

Benvenuto J Cellini.

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

BENVENUTO CELLINI,

                                          Case No.:

      Plaintiff,

v.

BAYVIEW LOAN SERVICING,
NEWREZ LLC DBA SHELLPOINT MORTGAGE
SERVICING, and THE BANK OF NEW YORK
MELLON A/K/A THE BANK OF NEW
YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2006-20CB
 MORTGAGE PASS THROUGH
CERTIFICATES SERIES, 2006-20CB

      Defendants.

_____/

# EXHIBIT D



### Shellpoint
Mortgage Servicing

55 Beattie Place, Suite 110
Greenville, SC 29601

Toll Free Phone 1-800-365-7107
Toll Free Fax 1-866-467-1137

*Hours of Operation*
Monday-Friday 8:00AM 10:00PM
Saturday 8:00AM-3:00PM

April 23, 2021

Benvenuto J Cellini
7719 Hatteras Drive
Hudson, FL 34667

RE:     Subject Property: 7719 Hatteras Drive, Hudson, FL 34667
        Reference Number: 0579472631

Dear Benvenuto J Cellini:

This letter is in response to your recent inquiry regarding the loan referenced above. Shellpoint Mortgage Servicing ("Shellpoint") began servicing the loan on or about February 1, 2020.

Shellpoint is aware this loan was included in a Chapter 13 Bankruptcy and was subsequently discharged. Our records indicate you intended to retain the property as well as your personal liability upon discharge and completion of the Chapter 13 plan. Therefore, Shellpoint is servicing the loan in accordance with the original agreement and protecting the creditor's rights in the associated property.

Upon review of your correspondence, Shellpoint's records indicate we have previously received the same or a similar correspondence, and we have already responded. Since your additional correspondence did not provide any new or additional information for us to form the basis for a new investigation, our response remains the same, and we will not be conducting another investigation. However, in keeping with our goal to achieve the highest level of customer satisfaction, please review the following information.

Your correspondence stated that Shellpoint did not know what Bayview did with your previous payments, and that the payments were not never applied by Bayview. Please note that we have already provided documentation to you in our previous response dated March 31, 2021 showing that all payments that you made to Bayview were correctly applied to the loan.

Please note that any payments received during an active Chapter 13 bankruptcy are paid to the trustee, who will then forward the payments to the loan servicer to be applied to the loan in accordance with the bankruptcy plan. The servicer applies payments to monthly installments only when specifically instructed by the trustee to do so.

Please note, when a borrower files for bankruptcy protection, Shellpoint must hire attorneys to represent our interest and the interest of the investor and to represent us in the bankruptcy proceedings. The legal fees are then charged to the borrower as stipulated in the deed of trust signed at origination.

Our records indicate that your bankruptcy plan included a cramdown. This cramdown resulted in $30,876.01 being written off from your principal. At the time the cramdown was applied, your principal was reduced from $335,876.01 to $305,000.00.

ELG04232021J

On March 3, 2020, an additional $34,295.50 was applied to your loan to pay off a portion of your outstanding fee balance. Of this payment, $44.00 was applied to your short payment fee balance, $200.00 was applied as a pool work payment, $325.00 was applied to title costs, $345.00 was applied to property inspections, $950.00 was applied to vacancy register fees, $1,150.00 was applied to bankruptcy costs, $3,264.00 was applied to securing-related costs, $4,000.00 was applied to default-related costs, $5,654.97 was applied to prior servicer costs, $6,523.61 was applied to property preservation fees; and $11,738.92 was applied to attorney costs.

Regarding the property inspection fees, please note that anytime the loan becomes 45 days delinquent, the property is inspected to verify its occupancy and condition. Inspections continue every 30 days until the delinquency is resolved with either a posted payment or an agreement on the loan. There is currently a property inspection fee balance of $234.00.

Additionally, please note that foreclosure proceedings will cause additional foreclosure fees to be assessed to the account.

As of the date of this letter, there remains a foreclosure cost balance of $1,230.00, an NSF fee balance of $20.00, a property inspection fee balance of $234.00, a title cost balance of $350.00, and a short payment fee balance of $11.00. The total fee balance is $1,845.00.

Your correspondence states that we were not accepting your previous payments, including a payment of $14,400.00 received on February 18, 2021, and two checks dated March 22, 2021, for the amounts of $1,200.00 and $5,352.74.

As stated in our previous correspondence, Shellpoint was unable to accept the payments referenced above because they were not sufficient to reinstate the loan. Accordingly, these payments were returned to you. Please note, our records indicate that we sent you a reinstatement offer on March 16, 2021, stating that a payment of $60,525.87 was needed by March 30, 2021 to reinstate the loan. We have enclosed an updated reinstatement offer. A total of $64,549.93 is needed to bring the loan current.

If you are not able to reinstate the loan with one payment, you have the option to request a workout agreement with our Loss Mitigation department through your single point of contact (SPOC), Janea Akudigwe. Such an agreement may include a repayment plan, loan modification, or deferment. For more information about possible workout options, please contact Janea by email at Janea.Akudigwe@shellpointmtg.com, or by phone at 832-775-7722. Please note that Janea is a loss mitigation specialist and cannot assist with matters related to the servicing of the loan such as payment and escrow disputes.

Your correspondence contained a request to change our previous reports to the consumer reporting agencies (CRA's). The information submitted to the CRA's was sent in compliance with the Fair Credit Reporting Act, and Shellpoint is legally obligated to furnish the CRA's with accurate information. Therefore, we cannot remove the reported delinquencies.

Please note, the lender-placed insurance policies that were purchased by Shellpoint for the account have already been cancelled. On August 4, 2020, Shellpoint refunded $4,097.34 to the escrow account for the lender-placed hazard insurance. On August 1, 2021, Shellpoint issued a full refund of $4,541.48 back to the escrow account for the lender-placed flood insurance.

Our records indicate that there is still a lapse in hazard insurance coverage the has prevented Shellpoint from issuing a refund for the remaining lender-placed hazard coverage that was purchased. For more information on how to remove this lapse, please refer to page 2 of the enclosed previous correspondence dated March 31, 2021.

While we apologize for any inconvenience, Shellpoint has determined that no error has occurred in the servicing of your loan. You have the right to request documentation supporting this determination.

Please refer to the enclosed response dated March 31, 2021, the lender-placed insurance cancellation letters, the updated reinstatement offer. We have also returned your two checks dated March 22, 2021, for the amounts of $1,200.00 and $5,352.74.

If you have any additional questions or concerns, please contact our Customer Service department at 800-365-7107.

ELG04232021J

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

BENVENUTO CELLINI,

                                    Case No.:

      Plaintiff,

v.

BAYVIEW LOAN SERVICING,
NEWREZ LLC DBA SHELLPOINT MORTGAGE
SERVICING, and THE BANK OF NEW YORK
MELLON A/K/A THE BANK OF NEW
YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2006-20CB
 MORTGAGE PASS THROUGH
CERTIFICATES SERIES, 2006-20CB

      Defendants.

_____/

# EXHIBIT E

  

Prepared by: NICHELLE MORRIS

LOAN #: 134825767

# NOTE

APRIL 28, 2006                                                    FLORIDA
[Date]                                                            [State]

7719 HATTERAS DR, HUDSON, FL 34667
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 349,875.00       (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
COUNTRYWIDE HOME LOANS, INC.
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of    7.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   FIRST          day of each month beginning on
JUNE 01, 2006      . I will make these payments every month until I have paid all of the principal and interest
and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its
scheduled due date and will be applied to interest before Principal. If, on   MAY 01, 2036        , I still owe amounts
under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $2,386.76

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment
to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of
the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment
unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other
loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge
shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from
me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the
Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated
as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN         calendar
days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000 % of my
overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

---

FLORIDA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP MORTGAGE FORMS - (800)521-7291

-5N(FL) (0005).01  CHL (08/02)(d)               Page 1 of 2

Initials: ____
Form 3210 1/01



*23991*

610   134825767   N   001   001



LOAN #: 134825767

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
BENVENUTO J. CELLINI          -Borrower                                          -Borrower

_____ (Seal)      _____ (Seal)
                                              -Borrower                                          -Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF

_____

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY: _____
     David A. Spector
     Managing Director

-5N(FL) (0005).01  CHL (08/02)          Page 2 of 2                          Form 3210  1/01

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
This document was prepared by:
NICHELLE MORRIS

COUNTRYWIDE HOME LOANS, INC.

5405 CYPRESS CENTER DR., #100
TAMPA
FL 33609

```
2006093791

Rcpt: 996062   Rec: 95.00
DS:1224.65     IT: 699.75
05/08/06       Dpty Clerk

JED PITTMAN, PASCO COUNTY CLERK
05/08/06 01:18pm   1   of   11
OR BK  6975   PG  1162
```

———————————— [Space Above This Line For Recording Data] ————————————

060099H                    00013482576704006
[Escrow/Closing #]              [Doc ID #]

# MORTGAGE

MIN 1000157-0006730568-6

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   APRIL 28, 2006            , together with all Riders to this document.
**(B) "Borrower"** is
BENVENUTO J CELLINI, AN UNMARRIED MAN

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
**(E) "Note"** means the promissory note signed by Borrower and dated   APRIL 28, 2006          . The Note states that Borrower owes Lender
THREE HUNDRED FORTY NINE THOUSAND EIGHT HUNDRED SEVENTY FIVE and 00/100

Dollars (U.S. $ 349,875.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  MAY 01, 2036             .
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**FLORIDA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**

Page 1 of 11

 -6A(FL) (0005)    CHL (08/05)(d)    VMP Mortgage Solutions, Inc. (800)521-7291            Form 3010  1/01
CONV/VA



OR BK **6975** PG **1163**
2 of 11

DOC ID #: 00013482576704006

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] 1-4 Family Rider
- [ ] VA Rider
- [ ] Biweekly Payment Rider
- [ ] Other(s) [specify]

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY                 of              PASCO                    :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

Lot 2, Sea Pines Subdivision Unit three, according to the Plat thereof, recorded in Plat Book 10, Page 8-9, of the Public Records of Pasco County, Florida

OR BK **6975** PG **1164**

3  of 11

DOC ID #: 00013482576704006

Parcel ID Number: 2224160040000000020                       which currently has the address of

7719 HATTERAS DR, HUDSON

[Street/City]

Florida    34667     ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

DOC ID #: 00013482576704006

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

OR BK **6975** PG **1166**
5   of   11

DOC ID #: 00013482576704006

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

OR BK **6975** PG **1167**
6 of 11

DOC ID #: 00013482576704006

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the

DOC ID #: 00013482576704006

amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

OR BK **6975** PG **1169**
8 of 11

DOC ID #: 00013482576704006

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless

DOC ID #: 00013482576704006
Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to

DOC ID #: 00013482576704006

which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

OR BK **6975** PG **1172**
11 of 11

DOC ID #: 00013482576704006

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____(Seal)
Kimberly Kraengel                          BENVENUTO J. CELLINI          -Borrower
                                           7505 HATTERAS DRIVE
                                           HUDSON, FL 34667             (Address)

_____          _____(Seal)
Lecia P. Toui                                                          -Borrower

                                                                       (Address)

                                           _____(Seal)
                                                                       -Borrower

                                                                       (Address)

                                           _____(Seal)
                                                                       -Borrower

                                                                       (Address)


STATE OF FLORIDA,                          County ss: Pasco
    The foregoing instrument was acknowledged before me this 28th of April 2006 by
Benvenuto J. Cellini, an unmarried person.

_____

_____

_____

who is personally known to me or who has produced   FL D/L   as identification.

                                           _____
                                           Notary Public

          Kimberly Kraengel
          MY COMMISSION # DD247402 EXPIRES
          October 19, 2007
          BONDED THRU TROY FAIN INSURANCE, INC.

VMP -6A(FL) (0005)       CHL (08/05)        Page 11 of 11              Form 3010 1/01

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

BENVENUTO CELLINI,

           Case No.:

      Plaintiff,

v.

BAYVIEW LOAN SERVICING,
NEWREZ LLC DBA SHELLPOINT MORTGAGE
SERVICING, and THE BANK OF NEW YORK
MELLON A/K/A THE BANK OF NEW
YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2006-20CB
 MORTGAGE PASS THROUGH
CERTIFICATES SERIES, 2006-20CB

      Defendants.

_____/

# EXHIBIT F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:
BENVENUTO J. CELLINI                          BK. No. 5:16-01439 JJT
A/K/A BENVENUTO CELLINI
A/K/A BENVENUTO JOHN CELLINI                  Chapter No. 13

          Debtor                              :
                          :
THE BANK OF NEW YORK MELLON AKA               :
THE BANK OF NEW YORK, AS TRUSTEE              :
FOR THE CERTIFICATEHOLDERS CWALT,             :
INC., ALTERNATIVE LOAN TRUST 2006-            :
20CB MORTGAGE PASS THROUGH                    :
CERTIFICATES, SERIES 2006-20CB                :
          Movant                              :
             v.                                :
BENVENUTO J. CELLINI                          :
A/K/A BENVENUTO CELLINI
A/K/A BENVENUTO JOHN CELLINI

          Respondent

## STIPULATION AND ORDER IN SETTLEMENT OF MOVANT'S OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN

**AND NOW**, this 31 day of March 2017, it is Stipulated and Agreed by the parties to this litigation, by and through their respective attorneys, J. Zac Christman, Esquire on behalf of **Benvenuto J. Cellini A/K/A Benvenuto Cellini A/K/A Benvenuto John Cellini**, and Mario J. Hanyon, Esquire of Phelan Hallinan Diamond & Jones, LLP on behalf of **The Bank of New York Mellon A/K/A The Bank of New York, as Trustee for the Certificateholders CWALT, INC., Alternative Loan Trust 2006-20CB Mortgage Pass Through Certificates, Series 2006-20CB**, as follows:

**WHEREAS**, Benvenuto J. Cellini A/K/A Benvenuto Cellini A/K/A Benvenuto John Cellini is the Debtor in the above-captioned bankruptcy;

WHEREAS, Benvenuto J. Cellini A/K/A Benvenuto Cellini A/K/A Benvenuto John Cellini is the owner of the premises located at 7719 Hatteras Drive, Hudson, Florida 34667 (hereinafter "Premises");

WHEREAS, The Bank of New York Mellon A/K/A The Bank of New York, as Trustee for the Certificateholders CWALT, INC., Alternative Loan Trust 2006-20CB Mortgage Pass Through Certificates, Series 2006-20CB is the holder of the mortgage on the Premises;

WHEREAS, Debtor's Chapter 13 Plan seeks to modify the principal balance of the mortgage held by Movant;

WHEREAS, Movant filed an Objection to the Confirmation of Debtor's Chapter 13 Plan;

NOW THEREFORE, the parties stipulate and agree as follows:

1. The parties agree that the Movant, **The Bank of New York Mellon A/K/A The Bank of New York, as Trustee for the Certificateholders CWALT, INC., Alternative Loan Trust 2006-20CB Mortgage Pass Through Certificates, Series 2006-20CB,** will amend its proof of claim to reflect a total secured claim in the amount of $305,000.00 at 2.4% for 30 years.

2. The remaining amount of Creditor's claim will be unsecured.

3. Debtor is responsible for all taxes and insurance for the Premises.

4. Debtor must provide proof of insurance and proof of paid taxes to Creditor upon Creditor's request.  Failure to provide proof of insurance and proof of paid taxes will result in grounds for filing a Motion for Relief.

5. The parties agree that in the event that the Debtor's bankruptcy case is dismissed for any reason or Debtor fails to receive a non-hardship Chapter 13 discharge under 11 U.S.C. §1328(a) this stipulation will be void and of no effect.

6. Chapter 7 Provision.  In the event the Debtors convert to a Chapter 7 during the pendency of this bankruptcy case, this stipulation will be void and of no effect.

7.  _Confidentiality_.  The specific terms of this Agreement, including the amount of any

settlement payments, will be kept confidential and the Parties and their counsel

agree not to disclose or publish the terms, conditions or covenants referred to in this

Agreement, except as follows:

    a.  As is required to comply with any applicable rules, statutes or regulations of

       any governmental agency; or

    b.  As may be reasonably necessary to conduct any litigation arising out of or

       concerning this Agreement.

8.  _Entire Agreement_.  This Stipulation contains or expressly incorporates by reference

the entire agreement of the parties and supersedes all prior negotiations.  This

Agreement shall not be modified or amended except by a written instrument

executed by all parties.

9.  The parties agree that a facsimile signature shall be considered an original signature.

**IN WITNESS THEREOF** and intending to be legally bound hereby, the parties to

the above-captioned action, by their respective attorneys, each of whom has been expressly

authorized to enter into this Stipulation of Settlement, set their signatures below.

Date: 3/31/17

Mario J. Hanyon, Esquire
Counsel for Movant

Date: 2/28/17

J. Zac Christman, Esquire
Counsel for Debtor